IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


ALYSIA GEARO,                              )        CASE NO.  1:19-cv-02737
                                           )
                    Plaintiff,             )        MAGISTRATE JUDGE
                                           )        KATHLEEN B. BURKE
        v.                                 )
                                           )
COMMISSIONER OF SOCIAL                     )
SECURITY,                                  )
                                           )        **<u>MEMORANDUM OPINION & ORDER</u>**
                    Defendant.             )


Plaintiff Alysia Gearo ("Plaintiff" or "Gearo") seeks judicial review of the final decision

of Defendant Commissioner of Social Security ("Defendant" or "Commissioner") denying her

applications for social security disability benefits.  Doc. 1.  This Court has jurisdiction pursuant

to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate Judge pursuant to the

consent of the parties. Doc. 13.

For the reasons explained herein, the Court **AFFIRMS** the Commissioner's decision.

### I.  Procedural History

On September 21, 2016, Gearo protectively filed applications for disability insurance

benefits ("DIB") and supplemental security income ("SSI").[1]  Tr. 15, 38, 81-87.  Gearo alleged a

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 11/23/2020).

disability onset date of August 31, 2016.  Tr. 15, 81.  She alleged disability due to issues with

walking, feet giving out after two hours, requiring a cane to walk to prevent falling, multiple

sclerosis ("MS"), depression and anxiety.  Tr. 29, 41, 45.

After initial denial by the state agency (Tr. 41-43) and denial upon reconsideration (Tr.

45-47), Gearo requested a hearing (Tr. 48-49).  A hearing was held before an Administrative

Law Judge ("ALJ") on August 24, 2018.  Tr. 437-474.  On December 27, 2018, the ALJ issued

an unfavorable decision (Tr. 12-27), finding that Gearo had not been under a disability, as

defined in the Social Security Act, from August 31, 2016, through the date of the decision (Tr.

16, 26).  Gearo requested review of the ALJ's decision by the Appeals Council.  Tr. 78-80A.  On

October 15, 2019, the Appeals Council denied Gearo's request for review, making the ALJ's

decision the final decision of the Commissioner.  Tr. 5-9.

## II. Evidence

### A.     Personal, vocational and educational evidence

Gearo was born in 1976.  Tr. 25, 81, 442.  Gearo worked in the past as a bartender, food

server, and management trainee.  Tr. 25, 444-452.  Gearo has a limited education.  Tr. 25.  The

highest grade Gearo completed in school was the 11th grade.  Tr. 443.  She is able to

communicate in English.  Tr. 25.  At the time of the administrative hearing, Gearo was residing

at a shelter.  Tr. 443.

### B.     Medical evidence

#### 1.     Treatment history

Gearo was diagnosed with MS in 2009.  Tr. 2002.  She received treatment for her MS at

the Mellen Center for Multiple Sclerosis at the Cleveland Clinic. Tr. 202.  On August 31, 2016,

Gearo saw Shauna Gales, PA, at the Mellen Center for an urgent visit regarding her MS.  Tr.

202-203.  Ms. Gales noted that Gearo was not currently on any DMT (disease modifying therapies) for her MS.  Tr. 203.  Gearo had discontinued taking Gilenya[2] in March/April of that year because she "was being stubborn" and her "family was telling her she didn't need to be on treatment and to change to a healthy lifestyle."  Tr. 203.  Gearo had tolerated Gilenya fine when she was taking it.  Tr. 203.  Gearo was doing okay for a while but she started to notice difficulty with walking and balance in mid-May and her symptoms had progressed over the prior 2-3 weeks.  Tr. 203.  Gearo had to hold on to the wall or a bar when walking.  Tr. 203.  She had recently attended a concert but had to bring a cane because of her unsteady balance.  Tr. 203. Gearo denied any falls but she did "fall into walls."  Tr. 203.  She had been sent home by her employer for "not looking good and not feeling well."  Tr. 203. Gearo had noticed increased tingling and numbness in her thighs and tightness in her calves.  Tr. 203.  She continued to have blurred vision.  Tr. 203.  Gearo reported increased anxiety with the worsening of her MS symptoms.  Tr. 203.  On physical examination, Ms. Gales observed Gearo to have a wide-based, unsteady gait.  Tr. 204.  Gearo did not use an assistive device, she could perform heel walk and toe walk, and she could perform tandem walk but with moderate imbalance and holding onto a rail.  Tr. 204.  Gearo exhibited lower extremity weakness, dysmetria (finger-nose and heel-shin) and blurred vision.  Tr. 204.  Ms. Gales treatment plan included starting Gearo on IVMP[3] 1gm for three days followed by a PO prednisone taper.  Tr. 204.  Ms. Gales also discussed restarting Gilenya and the possibility of medication and a psychology referral to address her mental health symptoms and a physical therapy consult to address Gearo's gait and balance issues.  Tr. 204.

---

[2] Gilenya is used to treat relapsing forms of MS.  *See* https://www.nationalmssociety.org/Treating-MS/Medications/Gilenya (last visited 11/23/2020).

[3] IVMP is an abbreviation for intravenous methylprednisolone and is a treatment used in patients with MS.  *See* https://pubmed.ncbi.nlm.nih.gov/10933772/ (last visited 11/23/2020).

Gearo saw Dr. Jeffrey Cohen, M.D., at the Mellen Center on September 26, 2016, for an urgent appointment.  Tr. 198-199.  Gearo relayed that her walking had not improved much since her recent IVMP treatment.  Tr. 199.  Gearo was working part-time as a bartender and server but, with her imbalance issues, she was struggling with her job and she was missing work and trying to work less hours.  Tr. 199.  Gearo was still without medication insurance but was pursuing options to obtain medication.  Tr. 199.  Gearo reported feeling stressed and frustrated with her MS, no insurance and financial difficulties.  Tr. 199.  She also reported leg spasticity, moderate fatigue, difficulty sleeping, misplacing objects and trouble finding words and getting lost in conversations.  Tr. 199.  Dr. Cohen assessed gait dysfunction, left leg/foot weakness/drop and imbalance, and depression.  Tr. 201.  Dr. Cohen referred Gearo to physical therapy for balance training, gait training, cane/walker assessment and left foot drop.  Tr. 201.  Once medication approval was obtained and labs were reviewed, Dr. Cohen recommended that Gearo start Gilenya.  Tr. 201.

On October 13, 2016, Gearo attended a physical therapy evaluation.  Tr. 193-197.  Gearo relayed that she was applying for disability.  Tr. 193.  She was having a hard time working, especially more than four hours.  Tr. 193.  She had been sent home from work early due to concerns regarding her imbalance.  Tr. 193.  Gearo relayed that she had intermittent pain in the lower extremity that was worse at night; she had to hold on to something and go slowly when navigating stairs; she had difficulty driving at night but not during the day; and she did not do well with exposure to extreme temperatures (hot and cold).  Tr. 193.  Gearo indicated that she was fatigued with minimal activity, explaining that one time she had worked two days in a row and slept the entire next day.  Tr. 193.  Gearo tried a straight cane but needed constant cueing for proper technique, which warranted further testing.  Tr. 196.  The physical therapist assessed the

4

following problems: decreased strength, decreased balance, increased time to complete functional mobility, abnormal tone/quality of movement, reduced understanding of management of deficits, decreased knowledge of exercise program, and impaired ambulation.  Tr. 196.  The physical therapist remarked that Gearo's prognosis was good.  Tr. 196.  Weekly physical therapy sessions were recommended.  Tr. 197.

During a second therapy session on November 16, 2016, Gearo reported barely being able to walk after a night of work and having to call off work the next day.  Tr. 191.  Gearo continued with gait training, including education regarding using a cane to increase stability.  Tr. 191.

Gearo saw Nurse Charlene Fink on March 10, 2017, for follow up regarding her MS.  Tr. 187-189.  Gearo was still without insurance and had not started back on DMT.  Tr. 188.  Gearo reported persistent imbalance and gait disturbance and she was using a cane more often.  Tr. 188.  Gearo had had a few episodes of dizziness over the prior three weeks that lasted less than a minute.  Tr. 188.  Gearo felt her vision was blurry.  Tr. 188.  Gearo was interested in traveling to Las Vegas with a friend and was hoping to get back on DMT and feel better.  Tr. 188.  Gearo was continuing to work part-time as a server and bartender.  Tr. 188.  Gearo was applying for disability and brought forms that she needed completed.  Tr. 188.  Gearo reported some depression and anxiety but she was not interested in further follow up with psychology and she had stopped her antidepressants because she did not feel they were helping that much.  Tr. 188.  Gearo reported pain in her legs, noting that her legs felt heavy.  Tr. 188.  She reported moderate to severe fatigue and adequate but interrupted sleep.  Tr. 188.  Gearo also reported that she had trouble finding words.  Tr. 188.  Nurse Fink observed that Gearo had a wide-based, ataxic and stiff gait.  Tr. 189.  Gearo was using a cane.  Tr. 189.  Nurse Fink ordered a further IVMP

treatment and recommended that Gearo resume physical therapy to help with her gait, balance and leg weakness.  Tr. 189.  Following Gearo's IVMP treatment, Nurse Fink recommended that a brain MRI be conducted to assess Gearo's response to the MS therapy.  Tr. 189.

Gearo had a brain MRI on May 10, 2017.  Tr. 212-213.  As compared to a July 20, 2015, MRI, the results showed "[m]ultiple intracranial white matter lesions compatible with multiple sclerosis.  Two new T2 lesions and no new enhancing lesions.  No significant parenchymal volume loss."  Tr. 212.

Gearo saw Dr. Cohen and Nurse Fink on May 11, 2017.  Tr. 177.  Gearo had not yet started Gilenya.  Tr. 178.  She continued to have intermittent vertigo and daily imbalance.  Tr. 178.  Gearo was using a cane as needed.  Tr. 178.  Gearo was continuing to work part-time but was worried she would not get back to her previous baseline.  Tr. 178.  She was recently treated in the emergency room for dizziness.  Tr. 178.  Gearo had heard about a new MS medication and wanted information on it.  Tr. 178.  Gearo was not having pain at the time of the visit.  Tr. 178.  She reported moderate fatigue and interrupted sleep due to nocturia but she was also waking up for no reason every three hours and unable to fall asleep.  Tr. 178.  Gearo also reported that she lost her train of thought.  Tr. 178.  Dr. Cohen observed an impaired gait.  Tr. 179.  Dr. Cohen recommended DMT and indicated that a different treatment (Ocrevus) would be explored because Gearo had been unable to get coverage for Gilenya.  Tr. 179.

Gearo saw Nurse Fink on August 2, 2017, for an urgent appointment.  Tr. 260-264.  Gearo reported greater reliance on her cane and an inability to walk very far because she tired and needed to sit down and rest before walking again.  Tr. 261.  Gearo resigned her bartender/server job at a restaurant because she could not perform the job any longer due to her imbalance and she felt she was a high fall risk.  Tr. 261.  She was still working her other part-

time bartender job.  Tr. 261.  Gearo was not on DMT and was appealing a decision regarding a new medication.  Tr. 261.  Gearo reported mild to moderate fatigue, adequate sleep, and fair concentration.  Tr. 261.  Gearo was using a cane and her gait was wide-based and mildly spastic. Tr. 262.  Nurse Fink assessed gait disturbance, dysesthesias, and depression.  Tr. 264.  She recommended that Gearo keep her psychology appointment that was scheduled that day; attend physical therapy for gait and balance training and fall prevention strategies; attend occupational therapy for hand and upper extremity dysfunction; and consider IVMP while waiting to start DMT.  Tr. 264.

Also, on August 2, 2017, Gearo saw Samantha Domingo, Psy.D., in the Mellen Center for MS Behavioral Medicine.  Tr. 273-275.  Gearo had not been seen by psychology for several months due to transportation issues and because Gearo felt she "had a handle on her symptoms." Tr. 274.  Dr. Domingo's assessment was that Gearo's mood and anxiety symptoms had worsened due to a decline in her physical functioning and occupational and financial stressors.  Tr. 274. Gearo endorsed passive suicidal ideation but denied any plan or intent.  Tr. 274.  Dr. Domingo strongly recommended that Gearo begin a trial of medication to help manage her depression because her level of anhedonia was impacting her ability to actively cope with her current circumstances.  Tr. 274.  Dr. Domingo also advised Gearo that she could benefit from ongoing psychotherapy to help manage her depression and anxiety symptoms.  Tr. 274.

Gearo had Ocrevus infusion treatments on August 15, 2017, and on August 29, 2017.  Tr. 280-281, 289-290.

During a September 27, 2017, family-medicine visit regarding right foot/ankle swelling, Gearo relayed that she had recently started on Paxil for her mood.  Tr. 358.  She was feeling better on it and her mood was stable.  Tr. 358.  She reported that she had recently started on a

new MS injection and was taking Neurontin for lower extremity burning.  Tr. 358.  The swelling
in her right ankle/foot had improved but she was still having intermittent pain if she hit her ankle
on something.  Tr. 358.  Gearo also reported intermittent pain and stiffness in her left knee.  Tr.
358.

On November 2, 2017, underwent an MS psychological re-evaluation at the Mellen
Center conducted by Amy B. Sullivan, Psy.D.  Tr. 329-338.  Gearo's current symptoms were
weakness/numbness in her legs; depression; and fatigue.  Tr. 330.  Gearo described her current
mood as "sad, agitated, with crying spells and depressed" and she felt "overwhelmed and
exhausted."  Tr. 332.  Dr. Sullivan noted that there was no evidence of active suicidal thinking
and no thoughts of hurting others.  Tr. 332.  Dr. Sullivan diagnosed mood disorder due to general
medical condition (MS) and anxiety disorder due to general medical condition (MS).  Tr. 333.

On March 24, 2018, Gearo presented at the emergency room reporting that she had been
depressed and, although she had no current plan to hurt herself, she did "not care if she [was]
here anymore."  Tr. 388.  Per Gearo's mother, who was present at the hospital, about five months
earlier, Gearo was living alone and her apartment was found to be in terrible condition.  Tr. 389.
Gearo subsequently moved in with a friend who had dropped Gearo off at Gearo's mother's
home earlier that day, indicating that they could no longer live together.  Tr. 389.  Gearo had
been neglecting her pet dog who Gearo was very close with and the dog had to be moved to a
new home.  Tr. 389.  Gearo's mother was concerned that Gearo was unable to care for herself
and might try to hurt herself.  Tr. 389.  Gearo stated that "Everybody would be better off if I
were dead."  Tr. 389.  Gearo had not been taking her prescribed Paxil for four months and had
not had a recent psychological follow up.  Tr. 389, 392.  After a psychiatry consult and

evaluation was completed, Gearo was admitted to the hospital.  Tr. 392.  She was given Zoloft and Atarax.  Tr. 392.

The following day, on March 25, 2018, a mental health assessment was performed by Dr. Arshlya Farheen Syeda, M.D., (resident) and Dr. Rajesh R. Tampi, MD, MS, DFAPA.  Tr. 398-403.  Following the assessment, Dr. Syeda concluded that Gearo was at high risk for acute suicide and although she had some protective factors (her mother and sister) she would benefit from inpatient psychiatric admission.  Tr. 402.  Dr. Syeda diagnosed major depressive order, single episode, severe with anxious distress and melancholic features and started Gearo on Zoloft to be taken daily and Atarax as needed for anxiety.  Tr. 403.  Dr. Tampi agreed with Dr. Syeda's assessment.  Tr. 403.

Gearo was hospitalized from March 25, 2018, until April 3, 2018.  Tr. 341-356.  During her hospitalization, Gearo slipped and fell while getting out of the shower.  Tr. 352.  Gearo's psychiatric symptoms improved and she was discharged in stable condition.  Tr. 353.  Gearo's diagnosis on discharge was mood disorder NOS.  Tr. 353.  At time of discharge, Gearo reported feeling well and her depression was much improved; she denied suicidal ideation, intent or plan; she was future oriented and optimistic; she was sleeping and eating well and there were no behavioral issues; and she had been social with peers and was attending groups.  Tr. 354.  Gearo was planning on staying with a friend after discharge.  Tr. 354.

### 2. Medical evidence upon which Gearo seeks a sentence six remand

As reflected in the Appeals Council order denying Gearo's request for review, Gearo submitted additional evidence, which included various medical records dated after the date of the ALJ's decision, i.e., December 27, 2018 (Tr. 12).  Tr. 6.  The records included records from the Cleveland Clinic, dated May 24, 2019; records from Fairview Hospital, dated April 29, 2019;

and records from Ohio Guidestone, dated January 16, 2019, to May 24, 2019.  Tr. 6.  The records are attached to Plaintiff's brief.  Docs. 15-2 through 15-5.

### 3.  Opinion evidence

#### a.  Treating nurse

On June 20, 2017, Charlene Fink, RN, MSN, APC, Gearo's treating nurse completed two medical source statements – a mental capacity statement and a physical capacity statement.  Tr. 256-259.

*Mental capacity statement*

In the mental capacity statement, Nurse Fink rated Gearo's functional abilities in the areas of understanding, remembering and applying information; interacting with others; concentration, persistence and maintaining pace; and adapting or managing oneself.  Tr. 256-257.  The available ratings were "none," "mild," "moderate," "marked," or "extreme."  Tr. 256-257.  At the end of the form, Nurse Fink listed multiple sclerosis as the "diagnosis and medical and clinical findings" that supported her assessment.  Tr. 257.

Nurse Fink opined that Gearo had no limitations in the areas of cooperating with others; handling conflict with others; stating own point of view; initiating or sustaining conversation; understanding and responding to social cues; responding to requests, suggestions, criticism, correction and challenges; keeping social interactions free from excessive irritability, sensitivity, argumentativeness or suspiciousness; maintaining personal hygiene and attire appropriate to a work setting; and being aware of normal hazards and taking appropriate precautions.  Tr. 256-257.

Nurse Fink opined that Gearo had mild limitations in the areas of understanding and learning terms, instructions or procedures; following 1 or 2-step oral instructions to carry out a

task; describe work activity to someone else; ask and answer questions and provide explanations; recognize a mistake and correct it; identify and solve problems; ask for help when needed; initiate and perform a task that she understands and knows how to do; work close to or with others without interrupting or distracting them; distinguish between acceptable and unacceptable work performance; set realistic goals; and make plans for oneself independent of others.  Tr. 256-257.

Nurse Fink opined that Gearo had mild to moderate limitations in the areas of working at an appropriate and consistent pace and sustaining an ordinary routine and regular attendance at work.  Tr. 257.  Nurse Fink opined that Gearo had moderate limitations in the area of working a full day without needing more than the allotted number or length of rest periods during the day.  Tr. 257.

Nurse Fink listed "unknown" in the rating column for the areas of sequence multi-step activities; use reason and judgement to make work related decisions; complete tasks in a timely manner; ignore or avoid distractions while working; respond to demands; adapt to changes; and manage one's psychologically based symptoms.  Tr. 256-257.

*Physical capacity statement*

In the physical capacity statement, Nurse Fink opined that Gearo was limited to lifting/carrying 2-3 pounds occasionally and limited to standing/walking for a total of less than 1 hour in an 8-hour workday, noting MRI of brain, dizziness, imbalance and unsteady gait as the medical findings supporting her assessments.  Tr. 258.  Nurse Fink opined that Gearo's ability to sit was not affected by her impairment and opined Gearo could sit for a total of 8 hours in an 8-hour workday and she could sit for 4 hours without interruption.  Tr. 258.

With respect to postural activities, Nurse Fink opined that Gearo could never climb, balance, or stoop and she could rarely crouch, kneel or crawl, noting imbalance and use of a cane as medical findings supporting her assessments.  Tr. 259.

Nurse Fink opined that Gearo was limited to occasional reaching and pushing/pulling and frequent fine and gross manipulation, noting bilateral hand tremors as medical findings supporting her assessments.  Tr. 259.  Nurse Fink opined that due to Gearo's imbalance, high risk of falls, and heat sensitivity associated with her MS, Gearo would have to avoid heights, temperature extremes and pulmonary irritants.  Tr. 259.

Nurse Fink indicated that Gearo had been prescribed a cane and she would need the ability to alternate positions between sitting, standing, and walking at will.  Tr. 259.  Nurse Fink reported that Gearo experienced mild pain, noting that Gearo used Neurontin, which increased her drowsiness.  Tr. 259.  When asked whether Gearo's pain would take her off task, Nurse Fink stated "unknown."  Tr. 259.  Nurse Fink also indicated it was "unknown" whether Gearo would require additional unscheduled rest periods outside of the standard half-hour lunch and two 15-minute breaks.  Tr. 259.  However, Nurse Fink added that MS patients could tire more easily especially in warm environments and when sleep is interrupted by nocturia.  Tr. 259.

### b. State agency reviewers

*Mental*

On September 11, 2017, state agency reviewing psychologist Karla Delcour, Ph.D., completed a psychiatric review technique ("PRT") and mental RFC assessment.  Tr. 309-327.  Dr. Delcour opined that Gearo had mild limitations in her ability to understand, remember and apply information and moderate limitations in her ability to interact with others; concentrate, persist or maintain pace; and adapt or manage oneself.  Tr. 321.

In the mental RFC assessment, Dr. Delcour opined that Gearo was not significantly limited in 16 out of the 20 mental activities that were rated.  Tr. 324-325.  Dr. Delcour rated Gearo as having moderate limitations in 4 activities – ability to maintain attention and concentration for extended periods; ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; ability to interact appropriately with the general public; and ability to respond appropriately to changes in the work setting.  Tr. 324-325.

Dr. Delcour further explained her RFC assessment, stating that Gearo was able to understand, remember and comprehend simple and multi-step instructions; she would benefit from supervision available to redirect as needed; breaks should be flexible to allow Gearo to attenuate her psychological symptoms; could have limited, superficial interactions with the general public; and she was able to perform work with few changes and where changes are explained in advance.  Tr. 326.

*Physical*

On July 17, 2017, state agency reviewing physician Steve E. McKee, M.D., completed a physical RFC assessment.  Tr. 33-34.  Dr. McKee opined that Gearo could lift/carry 20 pounds occasionally and 10 pounds frequently; she could stand/walk for a total of four hours out of an eight-hour workday and sit for a total of six hours out of an eight-hour workday; her ability to push/pull was unlimited other than as shown for her ability to lift/carry; she could  never climb ladders, ropes, scaffolds; she could occasionally climb ramps/stairs and balance; and she could frequently stoop, kneel, crouch and crawl; and she would have to avoid even moderate exposure to hazards, such as machinery, heights, etc.  Tr. 33-34.

13

Upon reconsideration, on September 8, 2017, state agency reviewing physician Maureen Gallagher, D.O., M.P.H., completed a physical RFC assessment. Tr. 301-309. Dr. Gallagher opined that Ge(r)o could lift/carry 20 pounds occasionally and 10 pounds frequently; she could walk for four hours in an eight-hour workday; a medically required hand-held assistive device was necessary for ambulation; she was able to sit for six hours in an eight-hour work day but would be required to periodically alternate between sitting and standing to relieve pain and discomfort; and her ability to push/pull was unlimited other than as shown for her ability to lift/carry. Tr. 302. Dr. Gallagher noted that the exertional limitations were supported by Ge(r)o's problems with fatigue and balance and her need to use a cane. Tr. 302. Dr. Gallagher opined that Ge(r)o could never climb ladders, ropes, scaffolds; she could occasionally climb ramps/stairs, balance, and crawl; and she could frequently stoop, kneel, and crouch; and she would have to avoid all exposure to hazards, such as machinery, heights, etc. Tr. 303-305 In reaching her conclusions, Dr. Gallagher considered Nurse Fink's June 20, 2017, opinion and found that it was not supported by the totality of the evidence and concluded that Nurse Fink's opinion was not very persuasive. Tr. 307.

## C.   Testimonial evidence

### 1.   Plaintiff's testimony

Ge(r)o was represented and testified at the hearing. Tr. 439, 442-464, 466, 468-469, 471-472. When asked why she was applying for disability, Ge(r)o indicated that she had a hard time walking and performing her normal daily functions. Tr. 452, 463-464. Ge(r)o used a cane for walking and had also started to use a walker. Tr. 452. Ge(r)o's walker had not been prescribed but she started using it because it makes things and walking easier for her. Tr. 473. She was scheduled to see a neurologist to discuss getting one prescribed. Tr. 472. Ge(r)o used her cane

for walking short distances (e.g., when in her own room) but, if she was walking around the shelter or if she was going to have to walk a long distance, Gearo would use her walker.  Tr. 454, 466.  As far as sitting down, Gearo relayed that she fidgets a lot and she gets cramps in her legs and she noted that she had been having swelling in her foot.  Tr. 452-453, 463-464.  Gearo had been using her walker for about a month and she anticipated that it might become permanent – she would prefer that it not be permanent but she felt that it was going to be permanent.  Tr. 454.  As recently as the morning of her hearing, Gearo had fallen in the shower.  Tr. 457.

Gearo also reported having a hard time concentrating and her vision starts to get blurry if she looks at a screen for too long.  Tr. 453, 457.  As far as her Gearo's difficulties with concentrating, she explained that she loses her focus easily and she gets side-tracked.  Tr. 454.  Due to vision loss in her left eye, Gearo has a hard time focusing on things.  Tr. 458.  For example, it takes her a long time to get through reading a page in a book.  Tr. 457-458.

Gearo was hospitalized in March/April for her depression and anxiety.  Tr. 453.  She was being treated with medication.  Tr. 453.  The medication helped a little bit but she relayed that her nerves were shot and she had a hard time being around a lot of kids while staying at the shelter.  Tr. 453.  When too many kids are around, Gearo walks away and self-isolates.  Tr. 454.  She feels the same way when there are too many people around her talking.  Tr. 454.  Gearo was interested in starting counseling but had not yet started any sessions as of the time of the hearing.  Tr. 453-454.  Since her in-patient hospitalization, Gearo had not had thoughts of harming herself.  Tr. 457.  While staying at the shelter, Gearo is required to perform onsite services, attend chapel, and attend classes.  Tr. 462.  Her onsite service is laundry because she is unable to work in the kitchen.  Tr. 462.  When Gearo is folding clothes, she has to sit down because she cannot perform the task standing up without losing her balance.  Tr. 462-463.  When she is not attending

to onsite services or classes, Gearo indicated she is usually in her room relaxing or sitting.  Tr. 464.  Gearo would occasionally go outside to smoke but she had a hard time dealing with all the people that were around who were usually complaining and, as a result, she had been cutting back on smoking.  Tr. 464.

In 2010, Gearo had tried practicing for the GED test for a short time but she indicated that her "MS kind of got in the way and [she] stopped going."  Tr. 455-456.  While staying at the shelter, Gearo was offered help to work towards obtaining her GED.  Tr. 455.  She was provided with some practice sheets to help prepare for the test but she had not recently taken any classes.  Tr. 455-456.

Gearo relayed that she always took her MS medication as prescribed but there had been times when she did not always take her mental health medications as prescribed.  Tr. 456-457.  Gearo reported having some dizziness and lightheadedness when she takes her medication at nighttime.  Tr. 458-459.  At least two or three times each week, Gearo does not shower because it is very exhausting for her to do so.  Tr. 459-460.  Gearo noted that her doctors had increased her Gabapentin and the new dosage made her very drowsy.  Tr. 461-462.

Gearo felt that her MS symptoms had worsened since 2016.  Tr. 460.  When asked what changes she had noticed, Gearo explained that her walking was off and she had a to use a cane and also a walker.  Tr. 460.  Gearo explained that, before her MS diagnosis, she had issues with depression and anxiety but her symptoms intensified after her MS diagnosis.  Tr. 460.  During the hearing, Gearo was observed to be rocking back and forth in her seat.  Tr. 460.  When her attorney inquired about it, Gearo indicated that it had being happening for about the last four years and she explained it was her anxiety, stating that "it's just my anxiety and when I start to

get to the point where my legs start feeling weird, I start rocking back and forth because I feel that it's going to stop it." Tr. 460-461.

### 2.      Vocational expert's testimony

A Vocational Expert ("VE") testified at the hearing.  Tr. 464-472.  The VE described Gearo's past work as a bartender, food server, and management trainee (shift leader).  Tr. 465-466.   The ALJ asked the VE to consider an individual who was Gearo's age and with her education and past work who was limited as follows: can lift and carry 20 pounds occasionally, but 10 pounds frequently; can sit for up to six hours in an eight-hour workday, but can stand and walk for only up to two hours in an eight-hour workday; requires the use of a cane for ambulation; will need to alternate positions for five minutes every 45 minutes without being off task; can only occasionally climb ramps and stairs, balance and crawl; can never climb ladders, ropes, or scaffolds; can frequently stoop, kneel and crouch; can never work at unprotected heights or near occasional moving mechanical parts; can tolerate only occasional and superficial interaction with the public, with superficial meaning no persuasion, arbitration, negotiation, or conflict resolution; and can tolerate occasional routine workplace changes where changes outside of the routine can be explained in advance.  Tr. 467.  The VE explained that the described individual could not perform Gearo's past work but the described individual would be able to perform sedentary, unskilled jobs, including final assembler positions, inspection positions; and table worker positions.  Tr. 469.  The VE provided national job incidence data for the identified jobs.  Tr. 469.

If the first hypothetical was modified such that a cane was required for ambulation and station, the VE indicated that there would be no jobs available.  Tr. 469-470.   Also, if the first

hypothetical was modified such that a walker rather than a cane was required for ambulation, the VE indicated that there would be no jobs available.  Tr. 470-471.

In response to questioning from Gearo's counsel, the VE indicated that there would be jobs available if a hypothetical individual was off task 15% or more of the workday and/or absent once a month or more on an ongoing basis.  Tr. 471-472.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[4] . . . .

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.    If claimant is doing substantial gainful activity, he is not disabled.

2.    If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous

---

[4] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

period of at least twelve months, and his impairment meets or equals a listed impairment,[5] claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[6] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors

to perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In his December 27, 2018, decision the ALJ made the following findings:[7]

1.  Gearo meets the insured status requirements of the Social Security Act through December 31, 2021.  Tr. 17.

2.  Gearo has not engaged in substantial gainful activity since August 31, 2016, the alleged onset date.  Tr. 17.

3.  Gearo has the following severe impairments: multiple sclerosis (MS), depression, and anxiety.  Tr. 17.

---

[5] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

[6] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

[7] The ALJ's findings are summarized.

4.    Gearo does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.  Tr. 18-19.

5.    Gearo has the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) (she can lift and carry up to 20 pounds occasionally and up to 10 pounds frequently; she can sit for 6 hours out of an 8-hour workday) except she can stand or walk for up to 2 hours in an 8-hour workday; she requires use of a cane for ambulation; she must have a sit/stand option in which she can alternate positions for 5 minutes every 45 minutes without being off-task; she can occasionally climb ramps and stairs; she can never climb ladders, ropes, or scaffolds; she can occasionally balance and crawl; she can frequently stoop, kneel, and crouch; she can never work at unprotected heights or near moving mechanical parts; she can have occasional and superficial interactions with the public (with "superficial" meaning no persuasion, arbitration, negotiation, or conflict resolution); and she can have occasional, routine workplace changes where the changes outside of the routine can be explained in advance.  Tr. 20-25.

6.    Gearo is unable to perform any past relevant work.  Tr. 25.

7.    Gearo was born in 1976 and was 40 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  Tr. 25.

8.    Gearo has a limited education and is able to communicate in English.  Tr. 25.

9.    Transferability of job skills is not material to the determination of disability.  Tr. 25.

10.   Considering Gearo's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Gearo can perform, including final assembler, inspection position, and table worker.  Tr. 25-26.

Based on the foregoing, the ALJ determined Gearo had not been under a disability, as defined in the Social Security Act, from August 31, 2016, through the date of the decision.  Tr. 26.

## V. Plaintiff's Arguments

Gearo argues that (1) the ALJ erred in finding that the opinions of Nurse Fink were "less persuasive overall"; (2) the ALJ erred in finding that the opinion of Dr. Delcour was "partially persuasive"; and (3) new and material evidence warrants a sentence six remand.  Doc. 15-1, pp. 1, 18-25.

## VI. Law & Analysis

### A.      Standard of review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the

case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**B.**     **The ALJ did not err in weighing Nurse Fink's opinions**

Gearo argues that the ALJ erred in finding that Nurse Fink's opinions were "less persuasive overall." For claims like Gearo's that are filed prior to March 27, 2017, the regulations define a "treating source" as a claimant's "own acceptable medical source" who "provides [the claimant], or has provided [the claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. §404.1527(a)(2).[8] Further, for claims filed prior to March 27, 2017, "acceptable medical source" includes licensed physician, licensed psychologist, licensed optometrist but does not include licensed advanced practice registered nurse or social worker. 20 C.F.R. § 404.1502(a).

Since Nurse Fink is not an "acceptable medical source," she is not a "treating source" subject to controlling weight analysis under the treating physician rule. *See e.g., Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530-31 (6th Cir. 1997) (treating chiropractor was an "other source," not an "acceptable medical source" within meaning of regulation, thus ALJ has discretion to determine appropriate weight to accord chiropractor's opinion based on all evidence in record).

Nevertheless, the opinion of a medical source who is not an "acceptable medical source" but who has seen a claimant in her professional capacity is relevant evidence. SSR 06-03p, 2006

---

[8] In his decision, the ALJ refers to 20 C.F.R. § 404.1520c and 20 C.F.R. § 416.920c as the regulations under which medical opinions are considered. Tr. 20. However, those regulations apply to claims filed after March 27, 2017. Gearo does not raise this as an issue in her appeal. Therefore, any challenge to the ALJ's citations to the incorrect regulations is waived. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) (internal citations omitted); *Meridia Prods. Liab. Litig. v. Abbott Labs.*, 447 F.3d 861, 868 (6th Cir. 2006).

WL 2329939, * 6 (August 9, 2006).   And, SSR 06-03p provides guidance as to how opinions of

medical sources who are not "acceptable medical sources" are to be considered, stating,

> Since there is a requirement to consider all relevant evidence in an individual's case record, the case record should reflect the consideration of opinions from medical sources who are not 'acceptable medical sources' and . . . [a]ltough there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or a subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

SSR 06-03p, 2006 WL 2329939, * 6.

Here, consistent with the regulations, the ALJ concluded that Nurse Fink was not an

"acceptable medical source."  Tr. 24.  Nevertheless, also consistent with the regulations, the ALJ

considered her opinion and explained the weight assigned to it, stating:

> The opinions of Charlene Fink, RN, MSN, APC are less persuasive. (Ex. 2F; Ex. 3F). While Ms.Fink is not an acceptable medical source as that term is defined by the Regulations, I am required to evaluate her opinions to the extent that they are supported by the evidence of record taken as a whole. (20 CFR 404.1513(a); 20 CFR 416.913(a)). On June 20, 2017, Ms. Fink completed two forms in which she issued regarding the claimant's physical and mental functioning. She stated that the claimant could only lift or carry up to 3 pounds occasionally; stand or walk for less than 1 hour in an 8-hour workday; could rarely or never engage in various postural activities; had manipulative limitations; and she needed to be able to alternate between sitting, standing, and walking at will. (Ex. 3F). She stated that the claimant had no limitations in many areas of mental functioning, mild limitations in others, and only up to moderate limitations in a few. She wrote "unknown" 7 times. (Ex. 2F). Ms. Fink's opinion regarding the claimant's physical functioning is inconsistent with the record, which indicates that despite noncompliance with her MS medication and the need to ambulate with a cane, the claimant largely presented in no acute distress with intact coordination and full muscle strength. These findings suggest that the claimant would be able to stand or walk for a total of 2 hours out of an 8-hour workday, with a sit/stand option and a cane for ambulation. Ms. Fink's opinion regarding the claimant's mental functioning is inconsistent with the record and falls outside her area of expertise. The evidence indicates that the claimant has more restrictive limitations in mental functioning. Therefore, I find this opinion less persuasive overall.

Tr. 24.

The ALJ clearly considered and weighed Nurse Fink's opinions and explained the reasons for finding those opinions "less persuasive overall." Gearo argues that the ALJ erred because the evidence and examinations support Nurse Fink's limitations. She points to an MRI showing two new T2 lesions that are compatible with MS. Doc. 15-1, p. 19 (citing Tr. 212). However, the ALJ did not ignore or reject Gearo's MS diagnosis or treatment that Gearo received for her MS. Tr. 17 (finding MS to be a severe impairment); Tr. 21 (discussing MS treatment history). Gearo also points to abnormal examination findings. Doc. 15-1, p. 19. However, the ALJ considered the examination findings. Tr. 21-22. While the examination findings included some abnormal findings, the ALJ found that, even though Gearo was not compliant with the MS therapies, she nevertheless "largely presented in no acute distress with intact coordination and full muscle strength." Tr. 24. Those findings, the ALJ found, did not support Nurse Fink's very restrictive opinion. *Id.* It is not for this Court to consider the evidence de novo. And, here, it is clear that the ALJ considered Nurse Fink's opinions in light of the record evidence and provided his reasons for finding that her opinions "less persuasive overall." Tr. 24. Furthermore, the ALJ was not required to analyze Nurse Fink's opinion under the "treating physician" rule and "[t]he opinion of a 'non-acceptable medical source' is not entitled to any particular weight or deference—the ALJ has discretion to assign it any weight he feels appropriate based on the evidence of record." *Noto v. Comm'r of Soc. Sec.*, 632 F. Appx. 243, 248–49 (6th Cir. 2015) (internal citations omitted).

In arguing that the ALJ erred in weighing Nurse Fink's opinions, Gearo asserts that the ALJ failed to consider that Nurse Fink worked together with Dr. Cohen to treat Gearo's MS. Doc. 15-1, p. 21. Gearo fails to explain how the ALJ not noting that connection requires reversal or remand, especially since Dr. Cohen did not author or co-sign the opinions.

Gearo also takes issue with the ALJ discounting Nurse Fink's opinions regarding Gearo's mental functioning limitations on the basis that the limitations were inconsistent with the record and because her opinion on those matters fell outside her area of expertise.  Doc. 15-1, p. 20. However, the ALJ actually found that the record supported more restrictive limitations in mental functioning than those contained in Nurse Fink's opinion.  Tr. 24.  For example, Nurse Fink opined that Gearo had no or only mild limitations in interacting with others.  Tr. 256.  However, the ALJ found that the evidence of record supported a finding of moderate limitations in interacting with others and found that Gearo had the RFC to only have occasional and superficial interaction with the public.  Tr. 19, 20.

Considering the foregoing, the Court finds that the ALJ did not err with respect to the weighing of Nurse Fink's opinion.

**C.**     **The ALJ did not err in weighing the opinion of state agency reviewing psychologist Dr. Delcour**

Gearo argues that the ALJ erred in finding that the opinion of the state agency reviewing psychologist was only "partially persuasive."  She contends that the evidence supports Dr. Delcour's limitations.

The ALJ discussed and weighed the opinion of Dr. Delcour, stating:

The opinion of State agency psychological consultant Karla Delcour, PhD is partially persuasive. (Ex. 6F; Ex. 7F). On September 11, 2017, Dr. Delcour reviewed the evidence available at the reconsideration determination, and opined that the claimant could understand, remember, and carry out simple and multi-step instructions; she would benefit from supervision to redirect her as needed; she should have flexible breaks to allow her to attenuate her symptoms; she could have limited, superficial interactions with the general public; and she could perform work with few workplace changes where such changes were explained in advance. This opinion is informed by Social Security program knowledge, but some of the limitations are vague and are not expressed in vocationally defined terms, and the extent of the limitations is not supported by the evidence. The record indicates that the claimant presented at times as depressed and anxious, and received inpatient services for suicidal ideation and planning. However, her hospital admission

occurred after at least four months of noncompliance with her medication, and after receiving psychotropic medication for approximately a week, she improved to the point where she was optimistic and stable enough for discharge. She largely presented at other examinations in no acute distress, with normal thoughts, cognition, fund of knowledge, orientation, memory, and speech. These findings suggest that although the claimant has limitations in interacting with the general public and in handling changes in routine, they are not work preclusive. Therefore, I give [sic] find this opinion to be partially persuasive overall.

Tr. 24.

As a non-treating source, Dr. Delcour's opinion was not entitled to analysis under the treating physician rule. *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006); *Daniels v. Comm'r of Soc. Sec.,* 152 Fed. Appx. 485, 490 (6th Cir. 2005). Nevertheless, the ALJ considered and explained the reasons for the weight assigned.

Gearo does not argue that the ALJ ignored evidence. She contends that the ALJ did not specifically cite evidence. However, the ALJ did cite to and discuss evidence regarding Gearo's mental health treatment. In doing so, the ALJ noted that the worsening of Gearo's mental health (as well as physical health) symptoms was associated with periods of non-compliance with prescribed treatment. Tr. 21, 23.

Gearo also argues that Dr. Delcour's opinion that Gearo would need supervision available to redirect her as needed is supported by Gearo's difficulty with attention and concentration and Dr. Delcour's opinion that Gearo would need flexibility in breaks is supported by evidence in the record regarding Gearo's fatigue, concentration and difficulty sleeping. Doc. 15-1, pp. 22-23. The symptoms that Gearo refers to as being supportive of Dr. Delcour's opinions are subjective. However, the ALJ considered Gearo's subjective statements but found them not entirely consistent with the evidence (Tr. 20-21) and Gearo has not challenged the ALJ's consideration and weighing of her subjective statements. Thus, Gearo's reliance upon her subjective statements regarding the severity or limiting effects of her symptoms to argue that the

ALJ should have assigned greater weight to Dr. Delcour's opinion is ineffective.  Additionally, the ALJ did not ignore evidence regarding suicidal ideation or abnormal objective mental examination findings, e.g., depressed affect, anxious affect and blunted affect.  Tr. 22-23.

Gearo also contends that there was error with the ALJ's decision to discount the opinion because he found that the limitations were not stated in vocationally relevant terms.  She argues that it was error for the ALJ to reach this conclusion without posing the limitations to the VE to determine whether the terms were not stated in vocationally relevant terms and/or without asking Dr. Delcour for clarification.

Although Gearo attempts to place the burden to develop the record on the ALJ, the burden to prove disability is upon the claimant.  *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).  Additionally, Gearo presents no legal authority in support of her claim that the ALJ was obligated to present specific hypotheticals to the VE and/or was obligated to seek additional information from Dr. Delcour.

Whether or not a medical source is recontacted is within the ALJ's discretion.  *See* 20 C.F.R. § 404.1520b(b)(2)(i) ("We *may* recontact your medical source.") (emphasis supplied).  Furthermore, "[i]n order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments.  Hypothetical questions, *however*, need only incorporate those limitations which the ALJ has accepted as credible."  *Parks v. Social Sec. Admin.*, 413 Fed. Appx. 856, 865 (6th Cir. 2011) (citing *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010) and *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993) (emphasis supplied)).  Thus, the ALJ was not obligated to include all of Dr. Delcour's limitations in the RFC.  Furthermore, the

ALJ explained his reasons for finding her opinion only partially persuasive and included in the VE hypothetical those limitations that he found credible and supported by the evidence.

Based on the foregoing, the Court finds that Gearo has not shown that reversal and remand is warranted for reweighing of Dr. Delcour's opinion. Nor has Gearo shown that reversal and remand is required to obtain further clarification regarding Dr. Delcour's limitations or to pose further hypothetical questions to the VE regarding Dr. Delcour's limitations.

**D.     Sentence six remand is not warranted**

Gearo argues that this matter should be remanded pursuant to sentence six of 42 U.S.C. § 405(g) for consideration of evidence submitted to the Appeals Council after the ALJ rendered his decision. The alleged new and material evidence is attached to Plaintiff's brief. Docs. 15-2 through 15-5.

The Sixth Circuit has repeatedly held that where, as here, the Appeals Council denies review and the ALJ's decision becomes the Commissioner's decision, the court's substantial evidence review is limited to the evidence presented to the ALJ. *See Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001); *Cline v. Commissioner,* 96 F.3d 146,148 (6th Cir. 1996); *Cotton v. Sullivan,* 2 F.3d 692, 696 (6th Cir. 1993); *Casey v. Secretary of Health & Human Servs.,* 987 F.2d 1230, 1233 (6th Cir. 1993); see also *Osburn v. Apfel,* No. 98-1784, 1999 WL 503528, at *4 (6th Cir. July 9, 1999) ("Since we may only review the evidence that was available to the ALJ to determine whether substantial evidence supported [his] decision, we cannot consider evidence newly submitted on appeal after a hearing before the ALJ."). Furthermore, a court "is charged with reviewing the decision of the ALJ, and not the denial of review by the Appeals Council, because when the Appeals Council denies review, the decision of the ALJ becomes the final

decision of the Commissioner." *Osburn*, 1999 WL 503528, at * 4 (citing *Casey*, 987 F.2d at 1233).

The statute permits only two types of remand: a sentence four remand made in connection with a judgment affirming, modifying, or reversing the commissioner's decision; and a sentence six remand where the court makes no substantive ruling as to the correctness of the Commissioner's decision. *See, e.g., Hollon v. Commissioner*, 447 F.3d 477, 486 (6th Cir. 2006). The court cannot consider evidence that was not submitted to the ALJ in the sentence four context; it can consider such evidence only in determining whether a sentence six remand is appropriate. *See Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir. 2007); *Foster*, 279 F.3d at 357.

The plaintiff has the burden under sentence six of 42 U.S.C. §405(g) to demonstrate that the evidence she now presents in support of a remand is "new" and "material," and that there was "good cause" for her failure to present this evidence in the prior proceedings. *See Hollon*, 447 F.3d at 483; *see also Ferguson v. Commissioner*, 628 F.3d 269, 276-278 (6th Cir. 2010) (although the material that the claimant sought to introduce was "new," the claimant failed to meet her burden of showing "good cause" for failure to submit the evidence and that the evidence was "material."). Evidence is "*new* only if it was not in existence or available to the claimant at the time of the administrative proceeding." *Ferguson*, 628 F.3d at 276 (internal quotations and citations omitted and emphasis supplied). "[E]vidence is *material* only if there is a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence." *Id.* (internal quotations and citations omitted and emphasis supplied). "A claimant shows *good cause* by demonstrating a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Id.* (internal quotations and citations omitted and emphasis supplied).

The records submitted to the Appeals Council post-date the ALJ's December 27, 2018, decision. They include records from the Cleveland Clinic, dated May 24, 2019; records from Fairview Hospital, dated April 29, 2019; and records from Ohio Guidestone, dated January 16, 2019, to May 24, 2019. Tr. 6; Docs. 15-2 through 15-5.

Gearo argues that the records relate to the time of the administrative proceeding because they demonstrate the ongoing mental health problems and treatment that Gearo was having. Doc. 15-1, pp. 24-25. Assuming arguendo that Gearo could demonstrate that the records, which post-date the ALJ's decision, are new and/or that she had good cause for not obtaining the treatment reflected in those records prior to the hearing, Gearo has not shown how they are material to the period at issue before the ALJ, i.e., the alleged onset date of August 31, 2016, through the date of the ALJ's decision. *See Casey v. Sec'y of Health and Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993(additional evidence pertaining "to a time outside the scope of [the] inquiry" not relevant). At best, the allegedly "new" and "material" evidence is evidence of a worsening condition. However, a sentence six remand is not appropriate to consider evidence that a claimant's condition worsened after the administrative hearing. *Walton v. Astrue*, 773 F. Supp. 2d 742, 753 (N.D. Ohio Jan. 18, 2011) (citing *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 685 (6th Cir. 1992)). If Gearo's condition seriously worsened after the administrative hearing, an appropriate remedy would be the initiation of a new claim for benefits as of the date that his condition rose to the level of a disabling impairment. *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 712 (6th Cir. 1988).

Based on the foregoing, the undersigned concludes that Gearo is not entitled to a sentence six remand for the purpose of considering additional evidence post-dating the date of the ALJ's decision.

### VII. Conclusion

For the reasons set forth herein, the Court **AFFIRMS** the Commissioner's decision.


Dated: November 24, 2020                    */s/ Kathleen B. Burke*
                                            _____
                                            Kathleen B. Burke
                                            United States Magistrate Judge